IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| DARRYL E. CAINE, | ) | Case No. 08 C 50103 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hon. P. Michael Mahoney |
| v. | ) | U.S. Magistrate Judge |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### I.    Introduction

Darryl E. Caine ("Claimant") seeks judicial review of the Social Security

Administration Commissioner's decision to deny his claim for Disability Insurance

Benefits ("DIB"), under Title II of the Social Security Act, and Supplemental Security

Income ("SSI") benefits, under Title XVI of the Social Security Act. *See* 42 U.S.C. §

405(g). This matter is before the Magistrate Judge pursuant to the consent of both parties,

filed on April 27, 2009. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

### II.    Administrative Proceedings

On August 10, 2004, Claimant applied for DIB and SSI, alleging a disability onset

date of November 30, 2000. (Tr. 61-65, 306-310.) Claimant's initial application was

denied on November 4, 2004 (Tr. 24-28.) His claim was also denied a second time upon

reconsideration on December 21, 2004. (Tr. 34.) Claimant then filed a timely request for

a hearing before an Administrative Law Judge ("ALJ"). (Tr. 36.) The hearing took place

on June 7, 2007, via video teleconference between Evanston, Illinois and Rockford, Illinois, before ALJ Maren Dougherty. (Tr. 326.) Claimant appeared and testified *pro se*, and vocational expert ("VE"), Susan Etenberg was present at the hearing, but did not testify. (Tr. 326-351.)

On July 5, 2007, the ALJ found Claimant was not disabled between November 30, 2000 ("onset") and May 18, 2005[1], and denied his claims for DIB and SSI. (Tr. 13-19.) Afterwards, on August 7, 2007, Claimant filed a Request for Review with the Social Security Administration's Office of Hearing and Appeals. (Tr. 8.) The Appeals Council denied Claimant's Request for Review on April 12, 2008. (Tr 5-7.) As a result of this denial, the ALJ's decision is considered the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 404.981, 416.1455, 416.1481. Claimant now files a complaint in Federal District Court, seeking judicial review under 42 U.S.C. §§ 405(g), 1383(c)(3).

### III.   **Background**

Claimant was born on July 29, 1961, making him thirty-nine years old on his alleged date of disability onset. (Tr. 61.) Claimant is six feet and three inches tall, and weighs approximately 170 pounds. (Tr. 82, 296.) As of the date of the hearing, Claimant lived in an apartment in Rockford, Illinois. (Tr. 340.) Claimant testified that he completed his high school education, had no difficulties reading and understanding the newspaper, and experienced no problems keeping track of his finances. (Tr. 340-341.) Claimant was able to drive himself to the hearing, and only reported problems driving when "the vehicle doesn't work right." (Tr. 341.)

---

[1] May 18, 2005 is the date on which Claimant resumed substantial gainful activity, working full-time for Bergstrom Manufacturing as a "power coating specialist." (Tr. 342.) This substantial gainful activity would automatically end the ALJ's analysis at Step One, and thereby require a finding that Claimant was not disabled.

On his Social Security Activities of Daily Living Questionnaire ("ADLQ"), completed on August 25, 2004, Claimant reported no difficulties using his arms or hands in any of the listed daily activities (i.e.: Using kitchen utensils to prepare a simple meal, carrying bags or groceries, taking out the trash, or opening lids on jars). (Tr. 99.) He also reported no problems while standing or moving about (i.e.: No issues getting in or out of a car, going up or down stairs, or performing various household chores). (Tr. 99-100.)

At the time of the hearing, Claimant was employed as a full-time "powder coating specialist" at Bergstrom Manufacturing. (Tr. 342.) Claimant's job required him to spray paint assorted metal parts in an assembly line. (Tr. 342.) According to Claimant, the job sometimes entailed lifting parts weighing up to seventy pounds. (Tr. 344.) Claimant reported no difficulty performing this work, and that his supervisors were satisfied with his performance. (Tr. 343.) Claimant testified that he has worked for Bergstrom in this capacity since 2005. (Tr. 343.) Claimant's record indicates that he was unemployed and received no income in 2004. (Tr. 79.)

From March of 2002 to the fall of 2003, Claimant was employed as a part-time janitor for Cardinal Building Services ("Cardinal"). (Tr. 102, 345.) Claimant's job consisted of polishing floors using a buffing machine, cleaning, and emptying the trash. (Tr. 345-346.) Claimant testified that he was required to regularly lift his equipment, buckets of water, and garbage bags. (Tr. 346.) According to the Claimant, these items would generally weigh between twenty and forty pounds. (Tr. 346.) At the hearing, he reported no difficulty lifting this weight. However, Claimant marked that he stopped

working for Cardinal due to his "medical condition" in the Work Activity Report. (Tr. 93.) The record indicates Claimant had an income of $1,565.05 in 2001. (Tr. 79.) Yet, the record does not specify where Claimant was employed during that time.

From 1994 through 2000, Claimant was employed in various capacities, most notably as an "oven loader" for Holsum Baking Company ("Holsum") from 1997 to 2000. (Tr. 102, 347.) As an oven loader, Claimant was required to lift trays of bread products and place them into the oven for baking. (Tr. 347.) Claimant testified that "a tray of regular buns weighed maybe . . . [twenty] to [thirty-five] pounds. A tray of sesame seed buns maybe [forty-five] to [sixty] pounds." (Tr. 347.) According to his Work Activity Report, Claimant marked twenty pounds as the heaviest weight he lifted in his capacity at Holsum. (Tr. 104.) Claimant has not claimed to have any difficulty performing his duties as an oven loader. In fact, he continued to work at Holsum until the bakery closed and his position was terminated in November of 2000. (Tr. 102, 347.)

Claimant asserts that he became disabled on or around November 30, 2000. (Tr. 61.) Claimant reported that he was disabled due to chronic shoulder and back pain. (Tr. 22, 34-35.) Claimant also has a record of abdominal pain and nausea.

## IV.    **Medical Evidence**

### 1. Shoulder Pain

From Feburary 5, 2000 to January 3, 2001, Claimant entered Rockford Clinic (hereinafter referred to as "RC") on six separate occasions, complaining of shoulder pain. (Tr.162, 164, 165, 169, 179, 181.) During Claimant's first two visits in February and March, Dr. Paul R. Schroeder, M.D., diagnosed Claimant with "left shoulder pain" and prescribed Motrin tablets for relief. (Tr. 179, 181.) According to the reports, both shoulders had a full range of motion and Claimant's grip strength was normal. (Tr. 179, 181.)

On August 7, 2000, Dr. Schroeder noted that x-rays of the shoulder were normal, diagnosed Claimant with "right shoulder pain," and prescribed Naprosyn[2]. (Tr. 169.) On October 20, 2000, Dr. Richard B. Fellars, M.D., diagnosed Claimant with bursitis ("inflammation") of the shoulders and prescribed Naprosyn for relief as well. (Tr. 165.)

Claimant returned to see Dr. Schroeder on November 6, 2000. (Tr. 164.) Dr. Schroeder noted that "both shoulders have full range of motion[, and] [t]here is no point tenderness." (Tr. 164) Dr. Schroeder prescribed Relafen[3] for Claimant's bursitis. (Tr. 164.) Upon follow-up on January 3, 2001, Dr. Schroeder's assessment was that Claimant's shoulder pain was resolving and added, "[h]e is still having some . . . discomfort, but it is better than before." (Tr. 162.) Dr. Schroeder noted that an MRI had

---

[2] Naprosyn is in a group of drugs called nonsteroidal anti-inflammatory drugs ("NSAIDs"). Naprosyn works by reducing hormones that cause inflammation and pain in the body. It is used to treat pain or inflammation caused by conditions such as arthritis, ankylosing spondylitis, tendinitis, bursitis, gout, or menstrual cramps. Drugs.com. http://www.drugs.com/naprosyn.html.

[3] Relafen is an NSAID that works by reducing hormones that cause inflammation and pain in the body. Relafen is used to treat pain or inflammation caused by arthritis. Drugs.com. http://www.drugs.com/relafen.html.

been scheduled for the following week. (Tr. 162.) The MRI results showed no signs of a "full-thickness rotator cuff tear[, but] [t]here [were] findings . . . compatible with tendinopathy [or] tendinosis." (Tr. 215.)

Claimant did not return to RC with shoulder pain again until May 1, 2001. (Tr. 158.) Dr. Schroeder again prescribed Naprosyn for relief. (Tr. 158.) On May 21, 2001, Claimant saw Dr. Schroeder, complaining of more pain in his left shoulder. (Tr. 156.) Dr. Schroeder recommended Claimant undergo physical therapy. (Tr. 156) On June 20, 2001, Dr. Schroeder noted that Claimant "does not feel [that] he is really getting better," but added that "[Claimant] is able to reach over his shoulder and also under . . . to touch his back[,] and he has full ranger of motion without any . . . tenderness." (Tr. 153.) During the follow-up exam on July 17, 2001, Dr. Schroeder reported that "[Cliamant's] shoulders do feel better." (Tr. 152.)

On August 14, 2001, Claimant saw Dr. David J. Dansdill, M.D., concerning his shoulder pain. (Tr. 146.) After a physical examination, Dr. Dansdill diagnosed Claimant's left shoulder with subacromial bursitis and biceps tendinitis. (Tr. 146.) Dr. Dansdill gave Claimant Vioxx[4] samples, and suggested a subcromial injection if Claimant did not improve within three weeks. (Tr. 146.)

---

[4] Vioxx is an NSAID that works by reducing substances that cause inflammation, pain, and fever in the body. Drugs.com. http://www.drugs.com/vioxx.html.

Three weeks later, on September 9, 2001, Dr. Dansdill reported that "[t]he Vioxx helped a little bit[,] but the pain continues." (Tr. 145.) Therefore, Dr. Dansdill injected Claimant's shoulder ("subacromal space") with Kenalog and lidocane. (Tr. 145.) Claimant was asked to return in eight to ten weeks. (Tr. 145.)

On October 30, 2001, Dr. Dansdill reported that Claimant "return[ed] today doing much better. Basically, the shoulders are much better since we injected them." (Tr. 144.) Dr. Dansdill spoke to Claimant "about the importance of stretching these areas before he does any heavy work, as this [pain] has a tendancy to reoccur." (Tr. 144.) The doctor's impression was that the rotator cuff tendinitis had been "resolved." (Tr. 144.)

On November 14, 2001, Claimant entered RC with an upper respiratory infection. (Tr. 149.) Claimant also complained of right shoulder pain. (Tr. 149.) Dr. Schroeder gave Claimant Motrin to treat the pain. (Tr. 149.)

From Feburary 9, 2002 to November 9, 2003, Claimant sought treatment for shoulder pain on twelve occasions. (Tr. 124, 125, 126, 128, 130, 133, 134, 137, 193, 258, 264, 289.) On February 9, 2002, Claimant entered Rockford Memorial Hospital (hereinafter referred to as "RMH") complaining of left shoulder pain. (Tr. 258.) Dr. Jason Bredenkamp, M.D., noted that Claimant had "taken no over-the-counter pain medication." (Tr. 258.) Dr. Bredenkamp gave Claimant Toradol[5] and reported, "[a]fter that he felt much better." (Tr. 258.) Claimant was given a prescription for ibuprofen and was "discharged home in good and improved condition." (Tr. 258.)

---

[5] Toradol is an NSAID that works by reducing hormones that cause inflammation and pain in the body. It is used short-term (5 days or less) to treat moderate to severe pain, usually after surgery. Drugs.com. http://www.drugs.com/toradol.html.

The following week, Claimant saw Dr. Schroeder on February 13, 2002 for a follow-up appointment. (Tr. 137.) Dr. Schroeder reported that Claimant was "feeling somewhat better regarding his shoulder." (Tr. 137.) "Both shoulders [had] full range of motion." (Tr. 137.) The doctor further noted in his assessment that the "left shoulder pain [was] resolving." (Tr. 137.)

The record does not indicate that the Claimant reported any significant shoulder issues again until September 24, 2002, when he returned to RC with left shoulder pain. (Tr. 126.) Dr. Schroeder reported that Claimant "was picking up some lawn chairs recently and had some pain in his left shoulder[,] which has continued." (Tr. 126.) The doctor noted that "[Claimant] has full range of motion of [both] shoulders with some pain . . . . [and] [t]here is no impingement sign." (Tr. 126.) The x-ray of the shoulder "appeared normal," but identified a "small subchrondral cyst." (Tr. 126, 183.) "[The cyst] may be a subtle indication of rotator cuff disease or impingement process." (Tr. 183.) The x-ray report added, "[I]f there is clinical indication, MRI may be of benefit. . . ." (Tr. 183.)

The MRI results returned on October 1, 2002. (Tr. 193.) According to the MRI report, there was "no definite evidence for a full-thickness rotator cuff tendon tear," and that "some tendinosis, bursitis, or small superior surface partial tear [could not] be excluded." (Tr. 193.)

Claimant continued to follow-up with Dr. Schroeder on October 25, 2002. (Tr. 125.) Dr. Schroeder noted:

> [Claimant] took . . . Vioxx for a month and it did seem to help. There is no current medicine use. . . . He did have the MRI which showed a possible abnormality. He was seen by Dr. McCarty for consultation . . . [Dr. McCarty] did not think there was a problem. . . . [Claimant] is doing some maintenance work, has no other complaints or problems."

(Tr. 125.)

Dr. Schroeder advised Claimant to take Advil for any shoulder pain. (Tr. 125.) He also offered to call in a prescription for Vioxx at any time upon Claimant's request. (Tr. 125.) Dr. Schroeder's assessment was that Claimant's left shoulder pain had been "resolved." (Tr. 125.)

Claimant returned to RC with weezing and coughing on November 4, 2002. (Tr. 124.) He also complained of left shoulder pain. (Tr. 124.) Dr. Schroeder diagnosed Claimant with "resolving" bronchitis, and advised Claimant to take Vioxx daily for his shoulder pain. (Tr. 124.)

A year later, on November 9, 2003, Claimant entered RMH with complaints of pain in his left shoulder. (Tr. 289.) The emergency room ("ER") report states that Claimant had "not tried any over-the-counter medicines other than cortisone cream [to treat his pain]." (Tr. 289.) Claimant was sent for an x-ray of his left shoulder, which found that "[t]here [was] no significant bone or joint abnormality[,] [t]here [was] no discrete fracture[,] [and] [t]here [was] no infiltrating destructive process." (Tr. 291.) "[Claimant] has full, active range of motion of his left shoulder." (Tr. 289.) Claimant was

given Motrin, a prescription for ibuprofen, and was advised to keep ice on his shoulder. (Tr. 289.) He was then discharged home "in good and improved condition." (Tr. 289.) There are no other medical records pertaining to Claimant's shoulder pain.

### 2. Neck and Back Pain

Claimant entered RC on May 5, 2000, with pain on the left side of his neck. (Tr. 175.) Dr. Schroeder diagnosed Claimant with "neck strain," prescribed Flexeril[6] for treatment, and recommended Claimant use a heating pad and Advil. (Tr. 175.)

On June 24, 2000, Claimant returned to RC, complaining of low back pain. (Tr. 173.) Dr. Schroeder diagnosed Claimant with "back pain," prescribed Motrin, and recommended Claimant use a heating pad. (Tr. 173.)

Claimant reported upper-back pain on July 17, 2000, while being treated for eczema. (Tr. 171.) Dr. Schroeder diagnosed Claimant with "muscle strain" and recommended Claimant use Flexeril, a heating pad, and Advil to relieve the pain. (Tr. 171.)

Almost two years later, on April 16, 2002, Claimant came to RC with a complaint of "left upper back pain." (Tr. 134.) Dr. Schroeder diagnosed Claimant with "back muscle strain." (Tr. 134.) The doctor prescribed Motrin and Flexeril for treatment. (Tr. 134.) Upon follow-up on April 23, 2002, Dr. Schroeder noted that "[Claimant's] back is feeling better." (Tr. 133.)

---

[6] Flexeril (cyclobenzaprine) is a muscle relaxant. It works by blocking nerve impulses (or pain sensations) that are sent to the brain. Flexeril is used together with rest and physical therapy to treat skeletal muscle conditions such as pain or injury. Drugs.com. http://www.drugs.com/flexeril.html.

On June 3, 2002, Claimant entered RMH with complaints of "posterior upper thigh [and] lower back pain." (Tr. 264.) Dr. Craig H. Brown. M.D., diagnosed Claimant with "[a]cute sciatica." (Tr. 264.) Dr. Brown recommended Claimant take "bedrest for two days . . . . [take] off work for [two] days, then no lifting over [twenty-five pounds] for one week." (Tr. 264.) Claimant was prescribed ibuprofen, Vicodin, and Flexeril, and then was discharged home. (Tr. 264.)

Upon follow-up, on June 6, 2002, Doctor Reena Rizvi, M.D. reported that Claimant "is feeling much better." (Tr. 130.) "[Claimant] was asked to start exercising and was given low back exercises . . . and was instructed on proper posturing during lifting." (Tr. 130.)

Claimant returned to see Dr. Schroeder on June 24, 2002 for another follow-up. (Tr. 128.) Dr. Schroeder noted that "[Claimant] thinks pain is better today," although, the pain had moved from his lower-right side to his lower left side. (Tr. 128.) Dr. Schroeder recommended Claimant take Advil for his back pain, and to continue the back exercises. (Tr. 128.) Dr. Schroder added, "[Claimant] may continue working his present job" as a part-time janitor. (Tr. 128.) The record does not indicate any other significant complaints of back or neck pain.

### 3. Abdominal Pain

Claimant checked into RMH on April 1, 2000, complaining of nausea, vomiting, and chest pain. (Tr. 200.) Dr. James Sullivan, M.D., prescribed Prilosec[7] and Compazine[8], excused Claimant from work for two days, and advised Claimant to follow-up with Dr. Schroeder. (Tr. 200-201.) Dr. Schroeder diagnosed Claimant with a "viral illness" and advised Claimant to "increase fluids, rest, and take Tylenol or Advil for the chest pain." (Tr. 178.)

Claimant followed-up with Dr. Schroeder on April 4, 2000. (Tr. 177.) Dr. Schroeder noted that "[Claimant] feels better today[,] and plans to return to work tomorrow." (Tr. 177.)

On August 13, 2000, Claimant entered RMH with complaints of nausea and vomiting. (Tr. 204.) Dr. Brian Stubitech, M.D., reported that "while in the [ER], [Claimant] had received a GI cocktail[9] and also received Prevacid . . . . Approximately [thirty] to [thiry-five] minutes later, [Claimant] was reexamined. . . . [Claimant] now claims to have resolution of symptoms." (Tr. 204.) Claimant was instructed to take Zantac and Maalox, and to return the next morning. (Tr. 205.)

---

[7] Prilosec (omeprazole) belongs to a group of drugs called proton pump inhibitors. Omeprazole decreases the amount of acid produced in the stomach. It is used to treat symptoms of gastroesophageal reflux disease (GERD) and other conditions caused by excess stomach acid. It is also used to promote healing of erosive esophagitis (damage to your esophagus caused by stomach acid).Prilosec may also be given together with antibiotics to treat gastric ulcer caused by infection with helicobacter pylori. Drugs.com. http://www.drugs.com/prilosec.html.

[8] Compazine is an anti-psychotic medication in a group of drugs called phenothiazines. It works by changing the actions of chemicals in the brain. It is used to treat psychotic disorders such as schizophrenia. It is also used to treat anxiety, and to control severe nausea and vomiting. Drugs.com. http://www.drugs.com/mtm/compazine.html.

[9] A gastrointestinal cocktail is a slurry of medications used to relieve symptoms thought to be gastric, and in some cases, given as a diagnostic challenge to establish a gastrointestinal source for certain symptoms. Drugs.com. http://www.drugs.com/dict/gastrointestinal-cocktail.html

Claimant followed-up with Dr. Schroeder on August 14, 2000. (Tr. 168.) Dr. Schroeder reported that "[Claimant] is feeling better." (Tr. 168.) Claimant was instructed to continue taking Maalox and Zantac as directed, and to "return to work tomorrow." (Tr. 168.) On August 28, 2000, Claimant followed-up at RC, and Dr. Schroeder reported, "[Claimant's] stomach is better now." (Tr. 167.)

On November 15, 2000, Claimant entered RMH complaining of nausea and vomiting. (Tr. 211.) Dr. Brown diagnosed Claimant with acute gastritis ("inflammation") and acute pancreatitis. (Tr. 211.) Claimant was prescribed Zofran[10], Bentyl[11], Pepcid, and Carafate[12]. (Tr. 212) Claimant was ordered to follow-up with Dr. Schroeder on the following day, to stop taking Relafen, and to take Mylanta a half-hour after meals and before bedtime. (Tr. 212.) Examinations of the chest and abdomen all came up "negative." (Tr. 213-214.) Claimant later followed-up with Dr. Schroeder on November 19, 2000. (Tr. 163.) Dr. Schroeder diagnosed Claimant with a resolving "viral illness." (Tr. 163.)

Claimant entered RMH on February 7, 2001 "with a three to four hour episode of chest pain." (Tr. 217.) Dr. Dale R. Gray, M.D., noted that Claimant's "heart tones were regular with no murmur or gallop." (Tr. 217.) "A stress echocardiogram ("ECHO") resulted in brief, intermittent chest pains with exercise, but the [ECHO] was normal at

---

[10] Zofran (ondansetron) blocks the actions of chemicals in the body that can trigger nausea and vomiting. It is used to prevent nausea and vomiting that may be caused by surgery or by medicine to treat cancer (chemotherapy or radiation). Drugs.com. http://www.drugs.com/zofran.html.

[11] Bentyl relieves spasms of the muscles in the stomach and intestines by blocking the actions of certain chemicals in the body. It is used to treat functional bowel or irritable bowel syndrome. Drugs.com. http://www.drugs.com/mtm/bentyl.html.

[12] Carafate is not greatly absorbed into the body through the digestive tract. It works mainly in the lining of the stomach by adhering to ulcer sites and protecting them from acids, enzymes, and bile salts. Carafate is used to treat an active duodenal ulcer. It can heal an active ulcer, but it will not prevent future ulcers from occurring. Drugs.com. http://www.drugs.com/carafate.html.

rest and with exercise." (Tr. 217.) Claimant's pain was eventually relieved with Dilaudid[13] (Tr. 218, 220.) Tests on Claimant's liver, gallbladder, and chest came back "negative" or "stable." (Tr. 230-232.) Claimant was ultimately diagnosed with "chest pain." (Tr. 236.) Claimant was then discharged that afternoon with no medications. (Tr. 217.) He was advised to follow up with Dr. Schroeder within two weeks. (Tr. 217.)

Upon follow-up, on February 13, 2001, Dr. Schroeder noted that "[Claimant] is having a bit of stress in his life because the bakery where he was working at closed. He is looking for work." (Tr. 160.) Dr. Schroeder diagnosed Claimant with gastritis, and prescribed Protonix[14] (Tr. 160.) On March 12, 2001, Dr. Schroeder noted that Claimant "is feeling better taking the Protonix," and that Claimant "would prefer to not refill the prescription at this time." (Tr. 159.)

Claimant complained of "abdominal discomfort with nausea" on May, 21, 2001. (Tr. 156.) Dr. Schroeder diagnosed Claimant with gastritis, and gave him a prescription for Zantac. (Tr. 156.)

On December 3, 2001, scans of Claimant's abdomen and chest revealed a "[s]ingle nondialated loop of air" which "could represent a sentinel loop[;] the result of an adjacent acute process in the abdomen[,] such as cholecystitis or pancreatitis." (Tr.

---

[13] Dilaudid (hydromorphone) belongs to a group of drugs called narcotic pain relievers, also called opioids. It is similar to morphine. Dilaudid is prescribed for the relief of moderate to severe pain. It works by binding to certain receptors in the brain and nervous system to reduce pain. Drugs.com. http://www.drugs.com/dilaudid.html.

[14] Protonix is in a group of drugs called proton pump inhibitors. It decreases the amount of acid produced in the stomach. Protonix is used to treat erosive esophagitis (damage to the esophagus from stomach acid), and other conditions involving excess stomach acid such as Zollinger-Ellison syndrome. Drugs.com. http://www.drugs.com/protonix.html.

188.) However, the "study was otherwise unremarkable." (Tr. 188.) Dr. Sullivan added, "If further imaging evaluation is clinically indicated, consideration for a [computed tomography, or "CT"] scan of the abdomen would be recommended." (Tr. 188.)

On December 31, 2001, Claimant came to RC with complaints of abdominal pain. Dr. Schroeder's assessment was that Claimant suffered from irritable bowel syndrome ("IBS"). (Tr. 141.) Claimant was given Bentyl for treatment. (Tr. 141.)

Dr. Rafat Sid Rizk, M.D., saw Claimant on January 2, 2002, concerning his abdominal pain. (Tr. 139, 241.) Dr. Rizk examined Claimant and ordered an esophagogastroduodenoscopy ("EGD") and CT scan of Claimant's abdomen. (Tr. 140.)

The CT scan results came back on January 10, 2002. (Tr. 187.) Dr. Rizk reported that "[w]hile the [CT] findings may represent an annular pancreas, underlying mass lesion, while doubtful, needs to be excluded and correlation with MRI of the pancreas is recommended." (Tr. 187.) Additionally, a nodule was found at the left lung base which "[could not] be further characterized." (Tr. 186.)

The following day, January 11, 2002, Claimant underwent an upper endoscopy at RMH. (Tr. 244.) After the procedure, Dr. Rizk diagnosed Claimant with duodenitis ("inflammation") and ruled out the possibility of Helicobacter pylori. (Tr. 244.) Claimant was given a prescription for Prevacid and discharged. (Tr. 244.)

Upon follow-up on February 6, 2002, Dr. Rizk noted that Claimant "reports he has no abdominal pain," and that "[o]ne episode of abdominal pain was relieved by Rolaids." (Tr. 138.) According to the doctor's assessment, Claimant's abdominal pain had been "resolved for the moment," and that "[r]eflux symptoms may be a possible contributing cause of his episodic pain." (Tr. 138.) Dr. Rizk added that "[Claimant's]

symptoms do not support . . . a diagnosis of annular pancreas." (Tr. 138.) Claimant was asked to follow up with Dr. Schroeder in May, in order to schedule a repeat CT scan to examine the nodule seen on January 10, 2002. (Tr. 138.)

On February 13, 2002, Claimant returned to RC complaining of abdominal pain. (Tr. 137.) Dr. Schroeder advised Claimant to "[c]ontinue taking the same medications given by Dr. Rizk," and "not to run to the [ER] whenever he has a problem, but to come and see [him] first if at all possible." (Tr. 137.)

On April 10, 2002, Claimant entered RC with complaints of "stomach discomfort." (Tr. 135.) Claimant reported that the pain felt "as though there is too much acid," and that he tried taking a few Tums for relief. (Tr. 135.) Dr. Schroeder prescribed Zantac for treatment. (Tr. 135.)

Claimant complained of abdominal cramping on April 16, 2002. (Tr. 134.) Dr. Schroeder believed that the symptoms were to due Claimant's IBS. (Tr. 134.) Dr. Schroeder ordered Claimant to take Motrin, Flexeril, and Bentyl. (Tr. 134.)

On May 7, 2002, Claimant returned to RC with chest pains. (Tr. 132.) Dr. Schroeder advised Claimant to take Advil for the pain. (Tr. 132.) During his visit, Claimant was also scheduled for a repeat chest CT. (Tr. 132.)

The CT scan results returned on May 17, 2002. (Tr. 184.) Dr. Schroeder reported that the "small basilar left lung nodule is probably benign. [But,] [g]iven the lack of any other chest abnormalities, a follow-up limited CT in the next [three-to-four] months . . . would be recommended to ensure stability in this indeterminate small nodule." (Tr. 184.) There are no further records provided pertaining to Claimant's abdominal pain.

### 4. Depression

During Claimant's treatment at RC on April 10, 2002, Dr. Schroeder asked Claimant about depression. (Tr. 135.) Dr. Schroeder noted that Claimant experienced trouble sleeping, "does not have any family[,] and apparently not many friends." (Tr. 135.) Claimant stated that he did not feel depressed. (Tr. 135.) Regardless, Dr. Schroeder encouraged Claimant to speak to him "in the future[,] if he does feel depressed." (Tr. 135.)

On May 24, 2002, Claimant "agreed that he might be depressed." Dr. Schroeder reported that Claimant's "eye contact was poor[,] and he seemed somewhat depressed." (Tr. 131.) Claimant was put on a prescription for Zoloft and asked to follow-up at RC in a month. (Tr.131.)

A month later, on June 24, 2002, Dr. Schroeder reported that Claimant "feels there is a difference" with Zoloft, and that "[h]e is happier" and "working part time now." (Tr. 128.) Dr. Schroeder continued the Zoloft prescription and diagnosed Claimant with "mild depression." (Tr. 128.)

### 5. Consultative Examination

The most recent and final medical record provided is a consultative disability examination report by Dr. Stephen C. Geller, M.D., completed on October 18, 2004. (Tr. 295.) In his report, Dr. Geller noted that Claimant completed his high school education, appeared slightly distracted or simplistic, was single and lived with his mother and brother, experienced some pain in the shoulder with resisted movements in the upper arm, and "does poorly with proverbs, can name only [four] large cities, is unaware of the relationship between the two presidents Bush, cannot name the continents, but is aware of

the four teams vying for the [W]orld [S]eries." (Tr. 295-296.) Dr. Geller stated that he was "suspicious" of Claimant's "intellectual deficits," but could make no firm assessment. (Tr. 296.)

Dr. Geller found no evidence of any ongoing chronic disease, and "doubted" if Claimant had a rotator cuff injury. (Tr. 296.) The doctor further noted that Claimant "had [a] gradual onset of left shoulder pain over the past [five-to-ten] years: a pain like a pulled muscle or strain," but "[had] no loss of range of motion or loss of strength, and can use his arm fully and completely without pain at various times." (Tr. 95.) Claimant's "motor power and coordination [was] intact; [his] grip strength and upper extremity power [was] full[;] . . . [he] has no difficulty manipulating coins; . . . has no difficulties getting on and off the exam table[;] and is capable of all gaits without assistance." (Tr. 296.) Dr. Geller's diagnostic impression was that Claimant experienced intermittent "[l]eft shoulder arthralgias" ("joint pain"), and had "occasional upset stomach." (Tr. 295, 296.)

## V. <u>Standard of Review</u>

The court may affirm, modify or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed *de novo*. *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are

entrusted to the Commissioner. *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir. 2001)

("Where conflicting evidence allows reasonable minds to differ as to whether a claimant

is entitled to benefits, the responsibility for that decision falls on the Commissioner.")

If the Commissioner's decision is supported by substantial evidence, it is

conclusive and this court must affirm. 42 U.S.C § 405(g); *see also Scott v. Barnhart,* 297

F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable

mind would accept as adequate to support a conclusion." *Binion,* 108 F.3d at 782. If the

ALJ identifies supporting evidence in the record and builds a "logical bridge" from that

evidence to the conclusion, the ALJ's findings are supported by substantial evidence.

*Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision

"lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the

case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).


## VI.  **Framework of Decision**

"Disabled" is defined as the inability "to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). A physical or mental

impairment is one "that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory

diagnostic techniques." 42 U.S.C § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity, (2) whether the claimant suffers from a severe impairment, (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments, (4) whether the claimant is capable of performing work which the claimant performed in the past, and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity ("RFC") and vocational factors.

**VII.** **Analysis**

**1.** **The ALJ properly considered the substantial medical evidence of record and built a logical bridge between the evidence and her determination that Claimant was not disabled.**

**A.** **Step One: Claimant is not currently engaged in substantial gainful activity.**

In the Step One analysis, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties and is done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If Claimant is engaged in substantial gainful activity, he or she is found "not disabled" regardless of medical condition, age, education, or work experience, and the inquiry ends. If Claimant is not engaged in substantial gainful activity, the inquiry proceeds to Step Two.

Here, the ALJ found that Claimant had not engaged in substantial gainful activity between November 30, 2000 and May 18, 2005. (Tr. 15.) Neither party disputes this decision. As such, this court affirms the ALJ's Step One determination and proceeds to Step Two.

**B.      Step Two: Claimant does not suffer from a severe impairment.**

Step Two requires a determination whether the claimant is suffering from a severe impairment. A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers a severe impairment, then the inquiry moves on to Step Three. If Claimant does not suffer a severe impairment, then the claimant is found "not disabled," and the inquiry ends.

Here, the ALJ determined that Claimant did not suffer from a "severe" impairment, as described in 20 C.F.R. § 404.1520(c). (Tr. 13-19.) The Magistrate Judge has been writing Social Security opinions for thirty-four years, and has never dealt with a Step-Two denial until now. Nevertheless, the issues here are whether there is substantial evidence that supports the ALJ's opinion, and whether the ALJ can build a logical bridge between that substantial evidence and her determination.

The ALJ first discusses Claimant's August 25, 2004 ADLQ. (Tr. 17.) Although the form was completed during Claimant's alleged period of disability, Claimant asserts, within the questionnaire, that he had no problems or difficulties performing everyday tasks such as carrying groceries or opening twist lids on jars. (Tr. 17, 99.) In the same

questionnaire, Claimant states that he had no issues standing up or moving about. (Tr. 99-101.) This is substantial evidence that Claimant suffered no significant functional limitations that would impinge his ability to work, by his own admission.

The ALJ acknowledged that Claimant was treated for intermittent shoulder and back pain symptoms from 2000 to 2003. (Tr.17.) However, the ALJ notes, "[c]linical exam findings were repeatedly normal[,] with no deficits and full range of motion in the shoulder and back. MRIs and x-rays of the left shoulder consistently failed to reveal any significant pathology." (Tr. 17.) The ALJ summarized the record further, "In August 2001, Dr. David Dansdill, an orthopedic specialist, . . . administered a course of corticosteroid injections. During a follow-up visit . . .  [Claimant] reported his shoulder pain symptoms had resolved." (Tr. 17.) The ALJ also noted that although Claimant was diagnosed with bursitis and tendonitis, he was "prescribed various non-steroidal[,] anti-inflammatory medications with good relief of pain symptoms." (Tr. 17.) The ALJ's understanding is consistent with the record.

The ALJ also considered Claimant's history of abdominal pain. (Tr. 17, 316.) The ALJ noted that Claimant's stomach pain was "treated conservatively . . . with various oral medications including Zantac, Maalox, and Pepcid," and that "[C]laimant's symptoms responded well to oral antacid medications." (Tr. 17.) The ALJ discussed Claimant's endoscopy "which revealed some mild inflammation and bacteria consistent with [H]elicobacter . . . . [Dr. Rizk] prescribed Prevacid. . . . [W]hen seen one month later in follow-up, [Claimant] reported his abdominal pain had completely resolved." (Tr. 18.) The ALJ's analysis is accurate and consistent with the record. (Tr. 135, 163, 167, 168, 177, 204, 205.)

During the period of alleged disability, Claimant worked part-time as a janitor in 2002 and 2003. (Tr. 344-345.) Considering Claimant's part-time status, the ALJ asked Claimant, "[I]f [Cardinal] had offered you full-time work[,] could you have done it?" (Tr. 346.) Claimant responded, "Yeah, I could have." (Tr. 346.)

In her decision, the ALJ notes that Claimant "testified that he applied for supplemental security income, and then was forced by the district office to apply for regular social security disability benefits, because he needed additional income and thought that was the purpose of the program." (Tr. 17, 347-349.) At the hearing, the ALJ attempted to get confirmation of Claimant's position: "[W]hat I'm interpreting then . . . is that if you had a job[,] you could have worked." (Tr. 348.) "[S]o when your job at [Holsum] ended, if you had been given that job at Bergstrom could you have done it?" (Tr. 348.) Claimant answered, "Yeah, yeah." (Tr. 348.) "That's the only reason I filed. . . . Public aide wouldn't give me any benefits." (Tr. 349.)

Although Claimant was apparently confused as to the purpose of Social Security benefits, his testimony clearly indicates that his impairments would not have prevented him from working. (Tr. 332-351.) In addition, nowhere in the record is there evidence that Claimant's shoulder impairment, back or stomach pains resulted in any significant functional limitations that hindered Claimant's ability to perform basic work-related activities. In fact, on June 24, 2002, in the midst of Claimant's alleged period of disability, Claimant's primary physician, Dr. Schroeder, stated specifically that Claimant "may continue working his present job" as a janitor without limitations. (Tr. 128.) As such, this court finds that the ALJ's analysis is consistent with the record provided.

2. **The ALJ reasonably relied on the Consultative Examiner's findings as one piece of evidence in support of her finding.**

Claimant argues that the ALJ erroneously relied on Dr. Geller's consultative examination. Specifically, Claimant takes issue with Dr. Geller's finding that there was "no evidence of any ongoing chronic disease." (Tr. 296.) This court finds that Dr. Geller's findings were consistent with the evidence in the record. (Tr. 133, 135, 144, 156, 168, 178, 184, 211, 215, 217-221, 244.) Additionally, the ALJ did not rely only on Dr. Geller's report, rather it was considered in conjunction with the entire medical record. This court finds no error.

3. **The ALJ was not required to contact Claimant's treating physicians.**

Under 20 C.F.R. § 404.1512(e), the ALJ is only required to re-contact treating physicians "when the evidence . . . received from [the claimant's] treating physician or psychologist or other medical source is inadequate for [the ALJ] to determine whether [the claimant is] disabled." *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

Here, there is substantial evidence (including, but not limited to, a vast medical record, a consultative examination, and Claimant's own testimony) to indicate that Claimant did not have any significant functional limitations that would prevent him from performing substantial gainful activity. The Claimant has not asserted, nor is there any independent evidence to show, that the record provided was incomplete, or inadequate in any way. Therefore, this court finds that the ALJ reasonably relied upon the substantial evidence within the record, and was not required to contact Claimant's treating physicians.

**4.      The ALJ reasonably found that Claimant did not have any mental impairment.**

Claimant asserts that the ALJ failed to consider Claimant's "apparent" cognitive defects and failed to request a consultative examination. Claimant bases his argument upon three instances in the record: Dr. Geller's consultative exam, a statement by Dr. Rizk, and Claimant's alleged confusion at the June hearing.

In his examination report, Dr. Geller noted that he was "suspicious of intellectual deficits," but could not "make a firm assessment." (Tr. 296.) Dr. Rizk once stated that Claimant "tends to speak very little to describe his discomfort." (Tr. 139.) Furthermore, Claimant may have failed to understand the nature of the Social Security hearing (and even the program itself). (Tr. 339-351.)

Claimant argues that the ALJ failed to order a consultative examination in order to probe for any mental impairment. This court does not agree. The ALJ is not required to order such examinations, but may do so if an applicant's medical evidence about a claimed impairment is insufficient. *See* 20 C.F.R. § 419.912(f); *see also Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). However, no such mental impairment had been claimed at the time of the hearing, nor is any mental impairment indicated within the medical record.

Case law establishes that the ALJ has an obligation to develop a full and fair record, but the claimant is responsible for providing medical evidence of his disability. *See Howell v. Sullivan*, 950 F.2d 343, 349 (7th Cir. 1991.) In this case, Claimant provides no reliable evidence that he suffered from a mental impairment that prohibited him from working. The evidence within the medical record does not require a consultative evaluation in this case.

Prior to the ALJ hearing, Claimant never alleged that he was disabled due to his mental capacity during the application process, or at the hearing itself. His medical record does not support a finding of mental disability. Claimant's work history gives no indication of an inability to perform work-related activities due to a mental impairment of any kind. His mental capacity has not affected his ability to work in the past, nor did it prevent him from performing adequately as a full-time "powder coating specialist" for Bergstrom Manufacturing at the time of the hearing. (Tr. 102, 342.) In fact, during the hearing, Claimant testified that he completed his high school education, did not attend special education classes, had no difficulties reading and understanding the newspaper, and experienced no problems keeping track of his finances. (Tr. 340-341.)

Although Claimant received treatment for "mild depression" (Tr. 128), no evidence has been provided to prove that Claimant suffered from a mental impairment that restricted his ability to perform any substantial gainful employment and would render him disabled. This court finds no error with the ALJ's determination.

# VIII.   Conclusion

In light of the forgoing reasons, the Commissioner's Motion for Summary

Judgment is granted, and Claimant's Motion for Summary Judgment is denied.

**ENTER:**

_____

**P. Michael Mahoney, Magistrate Judge**

**United States District Court**

**DATE: November 3,2010**